## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **J.D., a student with a disability, and** | : | |
| **D.D., his parent, on her own behalf and** | : | |
| **on behalf of J.D.**, | : | Case No.   19-cv-0129-JMY |
| | : | |
| *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| **THE PENNSYLVANIA VIRTUAL** | : | |
| **CHARTER SCHOOL**, | : | |
| | : | |
| *Defendant* | : | |

### <u>MEMORANDUM</u>

**YOUNGE, J.**                                                                    **November 30, 2020**

This is an appeal from the due process decision of a Hearing Officer under the

Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.* ("IDEA") and Section

504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").  The issue that was

before the Hearing Officer, and is now before this Court, is whether the school district

(hereinafter "PA Virtual" or "Defendant") met its obligations to the student, J.D., under the

IDEA and Section 504.  Specifically, J.D.'s mother, D.D., contends that J.D. was denied a free

appropriate public education for the summer 2018 extended school year, and further alleges that

PA Virtual's proposed programming for the 2018-2019 school year was inappropriate pursuant

to the IDEA and Section 504.

Pending before this Court are two cross-motions: (1) Defendant's Motion for Judgment

on the Administrative Record ("Def. Mot.," ECF No. 13), and (2) Plaintiffs' Motion for

Judgment on the Administrative Record ("Plfs.' Mot.," ECF No. 14).  The Court will first

provide an overview of the IDEA and Section 504, the applicable standard of review in administrative proceedings, and the procedural history of this case.  The Court will then summarize the Hearing Officer's findings of fact and conclusions of law.  Finally, the Court will analyze the merits of the parties' arguments raised in their respective motions for judgment on the administrative record.

For the reasons set forth below, the Court will grant Defendant's motion and deny Plaintiffs' cross-motion; thereby affirming the Hearing Officer's decision.[1]

## I.      IDEA AND SECTION 504 OVERVIEW

### A.      IDEA

In 1975, Congress provided that it would make funds available for state special education programs on the condition that states implement policies assuring a "free appropriate public education" (commonly known as a "FAPE") for all their disabled children.  20 U.S.C. § 1412(a)(1)(A); *see also C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010) ("Under the IDEA, a state receiving federal educational funding must provide children within that state a FAPE.").  "Congress passed the law known today as the [IDEA] 'to assure that all children with disabilities have available to them . . . a [FAPE] which emphasizes special education and related services designed to meet their unique needs[.]'"  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 756 (3d Cir. 1995) (quoting 20 U.S.C. § 1400(c)).

"A school district provides a FAPE by designing and implementing an individualized instructional program set forth in an Individualized Education Plan ('IEP'), which must be reasonably calculated to enable the child to receive meaningful educational benefits in light of

---

[1] The Court has considered the submissions made in support of and in opposition to the parties' respective motions, and finds this matter appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f).

the student's intellectual potential." *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 729-30

(3d Cir. 2009) (internal quotations omitted); *see also Board of Educ. of Hendrick Hudson Cent.*

*Sch. Dist. v. Rowley*, 458 U.S. 176, 187-204 (1982).  "Meaningful benefit" means that a student's

program affords the student the opportunity for significant learning in light of his or her

individual needs, not simply *de minimis* or minimal education progress.  *Endrew F. ex rel.*

*Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 1000 (2017); *see also K.D. by & through*

*Dunn v. Downingtown Area Sch. Dist.*,  904 F.3d 248, 254 (3d Cir. 2018).

      "An IEP is developed through collaboration between parents and school districts, and

must include an assessment of the child's current education performance, must articulate

measurable educational goals, and must specify the nature of the special services that the school

will provide." *Perkiomen Valley Sch. Dist. v. S.D. by & through J.D.*, 405 F. Supp. 3d 620, 624-

25 (E.D. Pa. 2019) (internal quotation marks and citation omitted).  If "parents believe that the

school district is not providing a FAPE for their child, they may unilaterally remove him [or her]

from the school, enroll him [or her] in a different school, and seek tuition reimbursement for the

cost of the alternative placement." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d

Cir. 2013).

      The IDEA provides recourse in the form of an impartial administrative due process

hearing.  *See* 20 U.S.C. § 1415(f).  "If either party is aggrieved by the findings and decision

reached after such a hearing, the IDEA further allows that party to file a civil suit in state or

federal court." *S.D.*, 405 F. Supp. 3d at 625.  "When parents challenge a school's provision of a

FAPE to a child, a reviewing court must (1) consider whether the school district complied with

the IDEA's procedural requirements, and (2) determine whether the educational program was

reasonably calculated to enable the child to receive educational benefits." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 249 (3d Cir. 2009).[2]

### B. Section 504

Section 504 also requires that Pennsylvania schools provide a FAPE to children with disabilities. *See* 34 C.F.R. § 104.33(a). Specifically, under Section 504 recipients of federal funds must "provide a [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." *Id.*; *see also A.B. v. Abington Sch. Dist.*, 440 F. Supp. 3d 428, 434 (E.D. Pa. 2020) ("As for Section 504, it and the IDEA do 'similar statutory work.'") (citing *P.P.*, 585 F.3d at 735). In other words, Section 504 "is parallel to the IDEA in its protection of disabled students: it protects the rights of disabled children by prohibiting discrimination against students on the basis of disability[.]" *P.P.*, 585 F.3d at 735; *see also* 34 C.F.R. § 104.4. A student with a disability who is otherwise qualified to participate in a school program, and was denied the benefits of the program or otherwise discriminated against, has been discriminated against in violation of Section 504. *See S.H. v. Lower Merion Sch. Dist.*, 729 F. 3d 248, 260 (3d Cir. 2013). A student who claims discrimination in violation of the obligations of Section 504 must show deliberate indifference on the part of the school district. *Id.* at 263-64.[3]

---

[2] Failure to adhere to a procedural requirement under the IDEA does not automatically constitute denial of a FAPE. *See C.M. v. Bd. of Educ. of Union Cty. Reg'l High Sch. Dist.*, 128 F. App'x 876, 881 (3d Cir. 2005). Plaintiffs bear the burden of showing that procedural irregularities resulted in a loss of educational opportunity for the student or meaningful participation in the IEP process for the parents. *Id.*; *see also* 20 U.S.C. § 1415(f)(3)(E)(ii).

[3] Because Plaintiffs' IDEA and Section 504 claims are parallel, *i.e.*, because both claims concern whether PA Virtual met its FAPE obligations to J.D., resolution of the IDEA issue also resolves the Section 504 issue. *See A.B.*, 440 F. Supp. 3d at 434 n.5.

## II.   STANDARD OF REVIEW FOR ADMINISTRATIVE PROCEEDINGS

In considering a challenge to an administrative decision on an IDEA claim, district courts employ a "modified *de novo*" standard of review.  *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  Under this standard, "although the [d]istrict [c]ourt must make its own findings by a preponderance of the evidence," it "must also afford due weight to the [Hearing Officer's] determination."  *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). Specifically,

> factual findings from the administrative proceedings are to be considered *prima facie* correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.  In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight.  [T]his means that a [d]istrict [c]ourt must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.

*Id*. (internal quotation marks and citations omitted).

Further, "claims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law . . . [W]hether the District fulfilled its FAPE obligations— [is] subject to clear error review as [a] question of fact."  *P.P.*, 585 F.3d at 735.  Lastly, the burden of proof is on the party bringing the administrative complaint, a burden that continues on appeal.  *See L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 391-92 (3d Cir. 2006) (citing *Schaffer v. Weast*, 546 U.S. 49, 62 (2005)).

### III.    PROCEDURAL BACKGROUND [4]

On May 9, 2018, PA Virtual offered notice of a proposed change in placement to an approved private school for J.D.; D.D. disagreed with it and timely filed for a due process hearing.  ("Compl.," ECF No. 2 ¶¶ 20-24.)  On October 11, 2018, after a two-day hearing, Pennsylvania Special Education Hearing Officer Michael J. McElligott, Esq. resolved the dispute in favor of PA Virtual.  (*See* Hearing Officer's Final Decision and Order, ODR No. 20703-17-18 ("Admin. Dec.").)  The Hearing Officer found that PA Virtual "met its obligations to [J.D.] under the terms of the IDEA [and Section 504] in its last-proposed March/April 2018 IEP and placement at a specialized school [(*i.e.*, the Elwyn-Davidson School)] for summer 2018 extended school year [('ESY')] programming and for 2018-2019 programming."  (Admin. Dec. at 19.)

On January 9, 2019, Plaintiffs initiated this action against PA Virtual seeking reversal of the Hearing Officer's decision.  (*See* ECF No. 1.)  In their Complaint, Plaintiffs attack the Hearing Officer's decision on several grounds: (1) "[t]he decision of the Hearing Officer is erroneous in that critical findings of fact are not supported by and/or are in direct contradiction of established facts" (Compl. ¶ 29); (2) "[t]he Hearing Officer committed errors of law by concluding that [D.D.] was provided with adequate notice of the proposed placement" (*id*. ¶¶ 30, 34); (3) the proposed placement was not the least restrictive environment such that PA Virtual failed to provide J.D. with a FAPE for the 2018 ESY programming and for the 2018-2019 school year (*id*. ¶¶ 30, 35); (4) the Hearing Officer violated the IDEA by refusing D.D.'s counsel the opportunity to cross-examine J.D.'s father, by denying D.D. the opportunity to call critical witnesses, and by directing the order of witnesses without adequate advance notice (*id*. ¶¶ 29, 31,

---

[4] When applicable, the Court adopts the pagination supplied by the CM/ECF docketing system, which does not always match the document's internal pagination.

37); and (5) the Hearing Officer erred in finding "that J.D. is not entitled to compensatory education for the failure of [PA Virtual] to offer an appropriate program and placement for the 2018 ESY session" (*id.* ¶ 30).[5]

On April 22, 2019, PA Virtual filed its Answer, denying Plaintiffs' allegations and asserting numerous defenses. (ECF No. 4.) On July 17, 2019, Plaintiffs filed a Motion to Supplement the Administrative Record (ECF No. 10), which the Court denied on March 12, 2020 (ECF No. 18). Lastly, on September 16, 2019, both parties filed motions for judgment on the administrative record. (*See* Def. Mot.; Plfs.' Mot.) These motions, as well as the filed responses are currently before the Court. (*See* "Def. Resp.," ECF No. 15; "Plfs.' Resp.," ECF No. 16.)

## IV.    HEARING OFFICER'S DECISION

### A.    Hearing Officer's Factual Findings [6]

---

[5] In addition to the IDEA and Section 504, Plaintiffs assert that PA Virtual's "actions and omissions constitute discrimination on the basis of disability" in violation of the Americans with Disabilities Act ("ADA"). (*Id.* ¶ 36); *see also* 42 U.S.C. § 12101 *et seq.* However, as correctly noted by the Hearing Officer, the due process proceedings "were held pursuant to 22 PA Code §§ 15, 711, neither of which provide jurisdiction to hear claims, or engage in fact-finding, in Pennsylvania related to ADA claims." (Admin. Dec. at 2 n.3.) Thus, this Court finds that it was appropriate for the Hearing Officer to conclude that any ADA claims must be dismissed on the basis of lack of jurisdiction. In addition, Plaintiffs' Complaint appears to assert a Fourteenth Amendment due process claim. (*See* Compl. ¶ 37.) Plaintiffs do not address this claim in their cross-motion, nevertheless this Court addresses D.D.'s due process rights *infra.* (*See* Section V.E.)

[6] In reviewing the Hearing Officer's factual findings, the Court has reviewed and considered all evidence within the administrative record, including the Hearing Officer's decision (Admin. Dec.), the July 31, 2018 Session I hearing transcript ("Session I Tr.," ECF No. 10-13), the September 14, 2018 Session II hearing transcript ("Session II Tr.," ECF No. 10-14), the Hearing Officer exhibits (HO1-HO9), PA Virtual's exhibits (S3-S4, S6-9, S12-S13, S15, S21-S23, S26, S28-S29, S34-S39, S41-S42, S44-S47, S49-S50, S52-S60, S62-S85), D.D.'s exhibits (P1, P3-P5, P8-P10, P12-P15, P18, P20-P21, P23-P24, P27-P29), and the Independent Educational Evaluation ("IEE") report authored by Dr. Steven Kachmar ("IEE Report," ECF No. 9-1). This Court finds that the Hearing Officer's critical findings of fact are *prima facie* correct and are supported as a whole by the administrative record.

As to the weight of testimony accorded to each witness who testified during the course of the two-day due process hearing, the Hearing Officer found that "[b]etween the two witnesses, and especially

7

J.D. is a nineteen-year-old student who enrolled in PA Virtual, a cyber charter school, in October 2017. (Admin. Dec. at 2 & ¶¶ 1, 5.) "The parties agree that [J.D.] qualifies under the terms of the [IDEA] as a student with autism and intellectual disability[,]" and also has a diagnosis of Tourette's syndrome, "which requires accommodation in the educational setting." (*Id*. at 2.)

In October 2017, J.D.'s "IEP team designed an IEP for [him]. In early November 2017, [D.D.] approved [PA Virtual's] recommended program and placement." (*Id*. ¶ 8; S-15; S-21 at 3.) "In late October 2017, [PA Virtual] requested permission to re-evaluate [J.D.], including specific questions for the neuropsychologist about the testing performed as part of [an] August 2017 discharge summary/report. In early November 2017, [D.D.] provided consent to re-evaluate [J.D.], along with an addendum with additional information and clarifications provided by her[.]" (*Id*. ¶ 9; S-22.) However, thereafter D.D. "did not communicate/coordinate with the private neuropsychologist for the evaluation process to which she had consented." (*Id*. ¶ 12; S-56 at 6-7; S-57; S-58; Session I Tr. at 91.)

"In late November 2017, [PA Virtual] requested permission to gather data on [J.D.'s] skills in the activities of daily living. [D.D.] refused to provide permission for the data-gathering." (*Id*. ¶ 15; S-37 at 3.) Also in late November 2017, "service providers retained by [PA Virtual] who were providing services in the student's home witnessed behavioral escalation which concerned them. [PA Virtual] recommended that [J.D.'s] IEP be revised to allow for strategies to be implemented for de-escalation, sensory integration, and behavioral strategies to

_____

where the testimony of the witnesses materially differed, the testimony of [PA Virtual's] assistant director of special education[, Ms. Julie Jaszcar,] was credited and accorded heavier weight than the testimony of [D.D.] A medium degree of weight was accorded to the testimony of all other witnesses." (Admin. Dec. at 10.) This Court accepts the Hearing Officer's credibility determinations and finds that no evidence in the administrative record justifies a contrary determination.

address the behavior witnesse[d] by the providers." (*Id*. ¶ 16; S-38; Session I Tr. at 89.) "A conflict [then] emerged between [D.D.] and [PA Virtual's] service providers who were providing services to [J.D.] in the home.  As of late November 2017, the service providers were no longer admitted into the home." (*Id*. ¶ 17; P-7; S-41; S-55.)

"In early December 2017, [J.D.] underwent a functional behavior assessment by an outside agency, as well as a physical therapy evaluation from an outside agency." (*Id*. ¶ 18; S-39; S-45.)  "In mid-December 2017, [J.D.'s] IEP team met to discuss [J.D.'s] IEP, and [PA Virtual] issued a notice of recommended educational placement ('NOREP') based on the revisions discussed at that meeting." (*Id*. ¶ 19; S-44; S-46; S-49.)

"In mid-January 2018, [PA Virtual] informed [D.D] that [J.D.'s] in-home services, which had not been delivered since November 2017 with the providers not being welcomed into the home, would be discontinued if the parent continued to bar the providers from the home." (*Id*. ¶ 22; S-55.)  Also in mid-January, D.D. "requested an independent educational evaluation at public expense.  [PA Virtual] responded that such a request was premature since it had not yet issued its re-evaluation report (based on the November 2017 permission from parent) because she had not communicated/coordinated with the private neuropsychologist retained to conduct the re-evaluation." (*Id*. ¶ 23; S-56; S-57; S-58.)  By "late January 2018, [PA Virtual] issued a NOREP indicating that it was discontinuing the in-home services, to be reinstated at the request of the parent when those providers would be admitted to the home." (*Id*. ¶ 24; S-60.)

"In early February 2018, [PA Virtual] issued a NOREP rejecting as moot [D.D.'s] request for an independent evaluation, pending [D.D.] allowing the private neuropsychologist to engage in the re-evaluation process for which [D.D.] had provided permission in November 2017." (*Id*.

¶ 26; S-63.)[7]  PA Virtual then "issued a re-evaluation report based on the data and input it had, but it could not include updated psycho-educational testing due to [D.D.'s] lack of communication/coordination with the private neuropsychologist."  (*Id.* ¶ 27; S-65.)  By late February 2018, PA Virtual "clarified the custody arrangement between [J.D.'s] mother and father.  [D.D.] has physical custody of [J.D.,] but [both] parents share joint legal custody (including educational decision-making)."  (*Id.* ¶ 29; S-69 at 3.)

"In March and April 2018, [J.D.'s] IEP team met to revise [his] IEP[.]"  (*Id.* ¶ 30.)  The March/April 2018 IEP provided J.D.'s present levels of:  behavior functioning, academic achievement, occupational therapy functioning, speech and language functioning, physical therapy functioning, and performance for transition planning in education, employment, and independent living.  (*Id.* ¶¶ 31-38; S-76.)  Furthermore, this IEP "contained parental input from both [J.D.'s] mother and father."  (*Id.* ¶ 39; S-76 at 54-55.)  This IEP also recognized J.D.'s "need for ESY programming, programming that would include instruction and related services in physical therapy, occupational therapy, speech/language therapy and sexuality education."  (*Id.* ¶ 44; S-76 at 82.)

"In early May 2018, [PA Virtual] issued a NOREP to each parent regarding its recommendations for summer 2018 ESY programming, as well as programming/placement for

---

[7] As part of the due process proceedings, the Hearing Officer ordered an IEE at public expense. (*See* Session I Tr. at 105.)  The IEE Report, which was conducted by Dr. Steven Kachmar, a licensed and certified school psychologist, was issued on March 6, 2019, well after the Hearing Officer issued his decision.  (IEE Report at 1.)  Dr. Kachmar was tasked with conducting extensive testing on J.D. in order to prepare a report with a current and comprehensive understanding of J.D.'s disability profile and to make recommendations for programming.  (*Id.*)  Dr. Kachmar opined that "J.D.'s needs can likely be most appropriately addressed through specialized and comprehensive school-based educational programming," and he ultimately recommended that J.D. "be provided with a Full-Time Level of Autistic Support in a school-based educational program."  (*Id.* at 57.)  In this Court's view, this recommendation provides strong support for the Hearing Officer's decision.

the 2018-2019 school year, in a specialized school-based setting.  [J.D.'s] father returned the

NOREP, approving the recommendation to a specialized school-based setting.  [J.D.'s] mother

disapproved the NOREP and requested the [instant] special education due process

proceedings[.]"  (*Id.* ¶ 46; S-78; S-79; HO-1.)  In mid-May 2018, J.D.'s father "provided consent

for [PA Virtual] to share information with specialized schools for potential placement in the

summer of 2018 and/or the 2018-2019 school year."  (*Id.* ¶ 47; S-80.)  This is because J.D.'s

father "has concerns that [J.D.] needs to gain skills which are not being developed adequately in

the home-based program and wishes to see [J.D.] educated with peers in a more structured

setting."  (*Id.* ¶ 48; S-76 at 64; Session I Tr. at 59.)[8]

PA Virtual identified a specialized school, the Elwyn-Davidson School, that "was willing

to accept [J.D.] and provide services according to [J.D.'s] IEP."  (*Id.* ¶ 49; S-83.)  "The school

serves students, ages 3-21, with autism and/or intellectual disability, as well as a host of other

disability profiles.  The specialized school was able to implement [J.D.'s] IEP for summer 2018

ESY programming" as well as the 2018-2019 school year.  (*Id.* ¶ 51; S-84; Session I Tr. at 86;

Session II Tr. at 4-18.)

"There was a misunderstanding and miscommunication regarding the provision of

services under [J.D.'s] IEP at the specialized school.  School administrators clarified the issue at

the hearing, but [D.D.] had not communicated with the school, or visited the specialized school,

or made any arrangements to have [J.D.] visit the specialized school, for either the summer of

---

[8] As for the weight of testimony accorded to J.D.'s father, the Hearing Officer noted in his decision that J.D.'s "father did not testify as a fact witness, nor was he a party to the complaint.  As a parent under the terms of the IDEA, he was invited to participate in the hearing, and to testify to the extent he wished to." (Admin. Dec. at 10.)  The Hearing Officer further found that J.D.'s father "exhibited authentic concern for [J.D.'s] well-being and [his] education" and that his testimony was "heartfelt and offered in good faith."  (*Id.*)

2018 or the 2018-2019 school year." (*Id.* ¶ 52; P-23 at 3; Session II Tr. at 7.)  Rather, in the

"summer of 2018, [J.D.] received private education services funded by [D.D.] through a trust

established as the result of a prior round of special education due process." (*Id.* ¶ 53; P-24; P-27;

P-28.)  "In the home-based programming, [J.D.] spends the entire day with adults and receives

no instruction, and indeed has limited/no interaction with same-age peers." (*Id.* ¶ 54; Session I

Tr. at 70, 76-80; Session II Tr. at 86, 102.)

      **B.**      **Hearing Officer's Legal Conclusions**

          1.      *IDEA*

              a.      <u>Summer 2018 ESY</u>

The Hearing Officer found that PA Virtual's proposed March/April 2018 IEP and

placement at the specialized school (*i.e.*, the Elwin-Davidson School) were reasonably calculated

to provide a FAPE in the least restrictive environment for J.D.'s summer 2018 ESY

programming. (*See* Admin. Dec. at 11-14.)  Specifically, the Hearing Officer found that

placement at the specialized school by PA Virtual "is highly appropriate, in general and

especially in light of how it would have addressed [J.D.'s] needs." (*Id.* at 12.)  To reach this

legal conclusion, the Hearing Officer first recognized that J.D.'s March/April 2018 IEP calls for

ESY programming, "including direct instruction and related services." (*Id.* at 12.)  Next, the

Hearing Officer found that the "ESY programming proposed by [PA Virtual] . . . includes the

critical transition, vocational, and peer-interaction instruction that [J.D.] requires." (*Id.*)  The

Hearing Officer further found that the "record is overwhelmingly preponderant that as [J.D.]

moves into early adulthood, these issues (with their attendant needs in terms of communication

and behavior) are becoming of paramount importance" and that the "peer-access and peer-

interaction available at the specialized school are also factors in rendering the placement the

[least restrictive environment]." (*Id*.) Having found that PA Virtual proposed an IEP and

placement that provided a FAPE to J.D. for the proposed summer 2018 ESY programming, the

Hearing Officer denied D.D.'s claim for reimbursement for privately-funded summer

programming. (*Id*. at 14.)

b. <u>2018-2019 Proposed Programming</u>

The Hearing Officer also found that PA Virtual's proposed March/April 2018 IEP and

placement at the specialized school were reasonably calculated to yield meaningful benefit in the

least restrictive environment to J.D. in the 2018-2019 school year. (*Id*. at 15.) The Hearing

Officer reasoned that the "IEP and placement are crafted to allow [J.D.] to engage in significant

learning given [J.D.'s] unique needs." (*Id*.) The Hearing Officer also noted that "[t]his legal

conclusion is based on the same considerations that underpin the conclusion above regarding the

proposed IEP/placement for the summer 2018 ESY program." (*Id*.) However, the Hearing

Officer further explicitly recognized that the March/April 2018 IEP contained information that

would "emerge in [J.D.'s] school-year programming in ways that it may not in summer

programming." (*Id*.) In this regard, the Hearing Officer explained that "the present levels of

performance—to the extent [PA Virtual] was allowed to develop it—is comprehensive and

provides a foundation for the IEP goals. Those goals are numerous and appropriate, each

providing clear and measurable guidance/structure for the student's progress, and each supported

by appropriate instruction and modifications. Additionally, the March/April 2018 IEP contains

comprehensive and appropriate transition goals and instruction, again bolstered by the vocational

and community-based experiences available through the specialized school." (*Id*.)

13

The Hearing Officer also opined on the "lack of parental participation in the re-evaluation process[.]"  (*Id.* at 16.)  Specifically, "[a]n additional facet to that lack of parental participation is the parent not visiting the school and/or not making the student available for such a visit."  (*Id.*)  The Hearing Officer noted that while this "is the parent's prerogative[,]" "it undercuts the parent's argument that the placement is inappropriate or that the placement was comprehensively considered by the parent, and by extension the IEP team."  (*Id.*)  Furthermore, although the Hearing Officer recognized that there was "a slight argument that the initial mis-communication about the services [J.D.] might receive at the specialized school led [D.D.] to believe it is [an] inappropriate placement," the Hearing Officer also found that this argument was "overwhelmed by the clear weight of the record that [D.D.] was simply not interested in the placement and did not give it any good-faith consideration."  (*Id.*)  In sum, the Hearing Officer found that PA Virtual met its obligations to J.D. under the IDEA in its proposal for the 2018-2019 school year as represented in the March/April 2018 IEP.  (*Id.*)

2.    *Section 504*

The Hearing Officer found that PA Virtual's "proposed programming [was] reasonably calculated to yield meaningful education benefit, in the least restrictive environment, to [J.D.] under the obligations of Section 504[.]"  (*Id.* at 17.)  The Hearing Officer recognized that the standards to judge the provision of FAPE under Section 504 are broadly analogous to the IDEA, and therefore adopted the foregoing analysis.  The Hearing Officer also noted that a "student who claims discrimination in violation of the obligations of Section 504 must show deliberate indifference on the part of the school district"—and further found that PA Virtual "has not in any way discriminated against [J.D.], or taken actions against [J.D.] with deliberate indifference in light of [J.D.]'s disabilities."  (*Id.* at 18.)  Thus, the Hearing Officer concluded that PA Virtual

14

"met its FAPE obligations to [J.D.] and did not discriminate against [J.D.] under the anti-discrimination provisions [of Section 504.]"  (*Id.*)

## V.    DISCUSSION

### A.    PA Virtual Complied With All Procedural and Substantive Requirements for the Development of J.D.'s IEP

Plaintiffs maintain that PA Virtual "failed to comply with the procedural and substantive requirements for the development of J.D.'s IEP for ESY programming and also for the [2018-2019] school year."  (Plfs.' Mot. at 13.)  In support of this contention, Plaintiffs take issue with the way in which PA Virtual provided notice of its proposed change in placement and the process through which it secured placement at the Elwyn-Davidson school.

First, Plaintiffs assert that the May 9, 2018 NOREP "that was provided to [D.D.], proposing the change [in] placement to an [approved private school], failed to identify the specific private school that was recommended for J.D.'s placement.  Rather, six separate schools were identified but only in the subsequent request to release and exchange information with those schools[, which occurred no later than May 13, 2018.]"  (*Id.* at 11, 13 (citing 20 U.S.C. § 1415); *see also* S-79, S-80.)

Section 1415(b)-(c) of the IDEA outlines the notification procedures and content requirements of a NOREP.  Specifically, "prior written notice to the parents of the child" is required "whenever the local educational agency . . . proposes to initiate or change . . . the educational placement of the child."  20 U.S.C. § 1415(b)(3)(A).  The statute further provides that such notice shall include—

(A) a description of the action proposed or refused by the agency;

(B) an explanation of why the agency proposes or refuses to take the action and description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;

(C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this subchapter and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

(D) sources for parents to contact to obtain assistance in understanding the provisions of this subchapter;

(E) a description of options considered by the IEP Team and the reason why those options were rejected; and

(F) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(1)(A)-(F).

The Court has reviewed the NOREP that was provided to both parents on May 9, 2018 (*see* S-78, S-79) and finds that it complied with the procedural requirements mandated by the IDEA.  *See* 20 U.S.C. § 1415(b)-(c).  The written notice clearly stated what type of action was proposed and provided a description of that action.  (*See* S-79 at 1-2.)  Specifically, the notice stated that PA Virtual "proposes that [J.D.] receives specially designed instruction and modifications in a specialized setting outside of the local education agency [('LEA')].  [PA Virtual] proposes [J.D.] remain with the LEA until the extended school year 2017-2018 services begin.  This will include Full-Time Autistic and Speech and Language Support and the following services: Speech and Language Therapy, Occupational Therapy, Physical Therapy, a Sexual Educator and Personal Care Aide."  (*Id*. at 2.)  The NOREP also provided a thorough explanation of why PA Virtual chose the proposed action, as well as an explanation of all options considered and the reasons other options were rejected.  (*Id*.)  Lastly, the NOREP clearly stated that the

16

educational placement recommended for J.D. is an approved private school.  (*Id*.)  Nothing in the

IDEA (or Section 504) required PA Virtual to disclose which specific specialized school had

been selected.  Therefore, the Court concludes that PA Virtual provided adequate notice of its

proposed placement and program.

Second, regarding placement at the Elwin-Davidson School, Plaintiffs assert that

"Elwyn's expression of interest in accepting J.D. for the ESY program was conditioned upon the

assurance that his IEP would be revised to significantly reduce the level of speech therapy,

occupational therapy and physical therapy that he was receiving under his current IEP.  The

Assistant Director of Special Education for [PA Virtual] agreed, in an e-mail communication

with Elwyn representatives, to reduce J.D.'s related services if he were to attend the Elwyn-

Davidson school."  (Plfs.' Mot. at 13-14.)[9]  Plaintiffs further assert that PA Virtual "never

presented [D.D.] with an IEP that was devised for implementation at [Elwyn-Davidson, and

given] that [PA Virtual] was recommending placement [at Elwyn-Davidson, PA Virtual should]

have ensured that at least one representative of that school participated in an IEP meeting."  (*Id*.

at 15.)

This Court agrees with the Hearing Officer's apt finding that there was a

"misunderstanding and miscommunication" regarding the provision of services under J.D.'s IEP

at Elwyn-Davidson.  (*See* Admin. Dec. ¶ 52.)  Nevertheless, testimony at the hearing clarified

---

[9] The e-mail communication at issue here involved a question from a parent liaison coordinator at Elwyn-Davidson and PA Virtual's Special Education Director, Julie Jaszcar.  (*See* P-23.)  In this e-mail exchange, the Elwyn-Davidson liaison coordinator asked: "Regarding Speech, OT, and PT, we can provide no more than 1 hour per week of each service.  Our classroom teachers also spend time in the classroom working on goals for these therapies in addition to the 1 hour per week spent actually in each therapy.  Do you think it would be appropriate to revise the IEP to 1 hour per week for each of these therapies?" Ms. Jaszcar responded: "Yes, we discussed in the IEP that once [J.D.] was in an [approved private school] the team would have the ability to integrate these skills into his daily instruction, thus not requiring this level of need from individual therapists."  (*Id*. at 3.)

that a student's programming at Elwyn-Davidson is not revised prior to his or her admission or attendance; rather, an IEP team meeting is routinely convened after the student has attended Elwyn for at least thirty days.  Specifically, Donna Toll, the Director of Elwyn-Davidson, testified that any revision to a new student's IEP would not be considered until the student had been attending Elwyn-Davidson for thirty days, and only then, through a convened IEP team meeting with parents and both school teams, would any revisions be made to a student's programming.  (*See* Session II Tr. at 6, 9.)  Moreover, in this Court's view and as noted by the Hearing Officer, had D.D. communicated with Elwyn-Davidson, or toured the campus when invited, any questions regarding available related services would have been clarified.  (*See id*. at 18.)  Thus, contrary to Plaintiffs' assertion, PA Virtual did not fail "to provide D.D. with an opportunity to review and discuss an IEP designed for the recommended placement at the Elwyn-Davidson school" and, thus, the Hearing Officer did not err in declining to credit D.D.'s assertion that "the parent was not provided with an appropriate IEP."  (Plfs.' Resp. at 1-2.)

Third, Plaintiffs contend that PA Virtual predetermined J.D.'s placement at an approved private school—*i.e.*, "a 'brick and mortar' school."  (Plfs.' Mot. at 18.)  Plaintiffs assert that "during the process of enrolling [J.D.] in PA Virtual," D.D. became "concerned and somewhat alarmed when Ms. Jaszcar . . . stated to D.D. in an e-mail, her opinion that J.D. should be placed in an approved private school."  (Plfs.' Resp. at 5.)  Plaintiffs maintain that "D.D. was justifiably concerned that Ms. Jaszcar had arrived at this conclusion before she, or anyone from PA Virtual had even met J.D.  D.D. believed that her son was being unfairly prejudged."  (*Id*.)  In response, PA Virtual argues that "[a]s no current comprehensive profile of J.D. existed upon J.D.'s enrollment at PA Virtual in October 2017, it was not possible to predetermine a placement for him."  (Def. Resp. at 16.)  PA Virtual further argues that Plaintiffs' "claim that Ms. Jaszcar's

early e-mail to D.D. predetermined a placement outside of PA Virtual is mischaracterized as explained by Ms. Jaszcar in her testimony." (*Id.*)

This Court agrees with PA Virtual. Upon review of the October 10, 2017 e-mail (*see* S-7 at 1-2), as well as Ms. Jaszcar's testimony (Session I Tr. at 83-84), the Court finds that PA Virtual did not predetermine J.D.'s placement at an approved private school. The e-mail, drafted by Ms. Jaszcar, is her written summary of a phone conversation between herself and D.D. (*See* S-7 at 1-2.) In this e-mail Ms. Jaszcar indicates that as discussed she reviewed the enrollment records provided from J.D.'s prior cyber school and noted that her recommendation would be an approved private school so that J.D. "could interact with peers safely due to the specialized training and oversight that setting offers while working on academic, behavioral and vocational goal areas." (*Id.*) However, Ms. Jaszcar qualified this by indicating that any decision to place a student is an IEP team decision and that she was not sure if she would be a member of J.D.'s IEP team. (*Id.*) As PA Virtual correctly notes, and as established by Ms. Jaszcar's testimony, her "comment in the e-mail at issue was made because her review of records demonstrated a recommendation from [J.D.'s prior cyber school,] for placement at an approved private school and that J.D. was experiencing severe regression and depression and therefore, this indicated that another cyber charter school setting might not have been effective for J.D. (Def. Resp. at 16 (citing Session I Tr. at 83).) Furthermore, Ms. Jaszcar testified as follows:

> Q.    Did you note concerns in your third paragraph in this October 10, 2017 e-mail?
>
> A.    Yes. And again, for the sake of transparency, I wanted to give her, you know, what my interpretation of those records was, assure her that I may or may not be a part of the IEP team, and any decision was certainly a full team decision, as I said in this e-mail.

***

Q.    In this e-mail, were you predetermining that J.D. should be in an approved private school or other placement outside of the cyber charter school?

A.    No.  However, I was letting her know there were a lot of other indications that he may best be served there.  But as I said at the end, this was not an IEP, and again, I just wanted to show transparency.

(Session I Tr. at 83.)

In summary, the Court finds that the Hearing Officer correctly found that PA Virtual complied with all procedural and substantive requirements for the development of J.D.'s IEP.

**B.    Least Restrictive Environment**

Plaintiffs argue that "[t]he proposed placement in Elwyn-Davidson is not the [least restrictive environment,]" and that the "home based environment is clearly J.D.'s least restrictive environment."  (Plfs.' Mot. at 15-16.)  Plaintiffs further assert that PA Virtual did not produce "any evidence to support its recommendation for changing J.D.'s placement to the Elwyn-Davidson School" and that this is clearly a more restrictive placement as J.D. "would only have exposure to students with disabilities."  (*Id*. at 16-17.)

The provision of FAPE also requires that the placement of a student with a disability be in the least restrictive environment ("LRE").  *See Oberti v. Bd. of Educ*., 995 F.2d 1204, 1209 n.6 (3d Cir. 1993).  Educating a student in the LRE requires that placement of a student with disabilities be supported, to the maximum extent appropriate, in an educational setting which affords exposure to non-disabled peers.  *See id*. at 1207.

The Court finds that PA Virtual adequately demonstrated before the Hearing Officer that its cyber program in the home classroom was not J.D.'s LRE, and that J.D. required the more

restrictive environment of a specialized school setting.  As the Hearing Officer correctly noted, "[w]hile in many (if not most) cases, placement in a specialized school centered on special education services for students with complex disability profiles would normally be considered a more restrictive placement on the continuum of educational placements, the specialized school placement offered by [PA Virtual] represents a less restrictive [environment] when compared to the exclusively home-based programming with no peer interaction at all, let alone in a structured way."  (Admin. Dec. at 12-13.)  Additionally, the testimony at the hearing supports the Hearing Officer's finding that "based on [J.D.'s] needs, the specialized school is both wholly appropriate, and the LRE, on its merits."  (*Id*. at 13.).  For example, the Director of Elwyn-Davidson, Ms. Toll, stated the following as to interaction and collaboration among peers at the specialized school:

> Q.    Could you give us an overview of what the program would be during the regular school year for [J.D.] in terms of academics, behavior support, related services and transition?
>
> A.    Sure.  So he would be . . . in the Connections Program in our Media campus, and that is approximately eight students per classroom.  Really depending on the level of the student, we go anywhere from six to eight.  Within that classroom environment there's a teacher, there's a classroom support staff, some students have one-on-ones, and some students have TSS's.  Our clinical services in nature are primarily collaborative in nature, because our students learn best within their natural environment, so they can go into the classroom and they're classroom-based services.  Some students still receive one-on-one services, but it's found, typically, especially for a student on the spectrum, learns better within their natural environment so they don't need to transfer the skills from an individual session into the classroom.

(Session II. Tr. at 5-6.)

21

Thus, the Court concludes that the proposed placement at Elwyn-Davidson, as opposed to the home-based cyber setting, is the LRE for J.D., and that the Hearing Officer did not err as a matter of law as to this finding.

### C.        Compensatory Reimbursement for Summer Services

As noted *supra*, the Hearing Officer denied D.D.'s claim for reimbursement for privately-funded summer programming.  (*See* Admin. Dec. at 14.)  Plaintiffs assert that "reimbursement is due" "for the services provided to J.D. over the summer based on the failure of [PA Virtual] to offer an appropriate IEP[.]"  (Plfs.' Mot. at 21-23.)  PA Virtual responds that "D.D.'s private program would only have been considered by the hearing officer if PA Virtual's program was determined ultimately not to have . . . provided [a] FAPE to J.D."  (Def. Resp. at 11.)

This Court agrees with PA Virtual.  Under the Supreme Court's precedents in *Burlington* and *Carter*, a two-step analysis should be applied to determine whether to order reimbursement. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985); *see also Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).  Known as the "*Burlington-Carter*" test, a court must first determine if the proposed IEP is inadequate in its provision of FAPE, and if it is, then the court must consider whether the private education services obtained by the parents are appropriate to meet the child's needs.  *Carter*, 510 U.S. at 15 (citing *Burlington*, 471 U.S. at 374).  Because this Court agrees with the Hearing Officer's finding that PA Virtual proposed an IEP and placement that provided [a] FAPE to J.D. for the 2018 ESY programming, the Court finds that the *Burlington-Carter* analysis ends at this point, and that reimbursement for the summer services is not appropriate or warranted.

D.        **Parental Participation**

Plaintiffs take issue with the Hearing Officer's "finding as to parental participation[.]" (Plfs.' Mot. at 35.)  Plaintiffs assert that the "Hearing Officer's finding that [D.D.] failed to co-operate with J.D.'s evaluation is contradicted by undisputed evidence of record."  (*Id*. at 36.) Specifically, Plaintiffs point out that in regard to the evaluation by the private neuropsychologist, Dr. Jay Stone, "D.D. testified that she did not recall receiving a phone call from him.  Nor was there any information provided to her in writing from Dr. Stone's office.  In fact, she has allowed every evaluator who wished to conduct an assessment of J.D. into her home."  (*Id*.)  PA Virtual argues in response that "the record shows that emails were sent to D.D. by Ms. Jaszcar with contact information for Dr. Stone and a request to call him to schedule the testing for the re-evaluation and also an email and letter from PA Virtual's counsel to D.D.'s counsel sending this same information, a request for his client to schedule testing and her not returning Dr. Stone's office's calls to her."  (Def. Resp. at 19.)

The Court finds that the administrative record supports PA Virtual's argument as well as the Hearing Officer's ultimate finding as to a lack of parental participation.  For example, upon questioning from Defendant's counsel at the hearing, Ms. Julie Jaszcar testified as follows:

> Q.        If you could look at School Exhibit 57.  This is a January 18, 2018 e-mail from myself to Mr. Stanczak.  Is the purpose of it to advise him that the neuropsychologist has been trying to get in touch with his client and there's been no response?
>
> A.        Yes.
>
> Q.        And did I provide the e-mail from the Center for Neuropsychology and Counseling to Mr. Stanczak with contact information?
>
> A.        Yes.

> Q.    Is School 58 yet another e-mail from me to Mr. Stanczak
>        dated January 24, 2018 about [D.D.] not returning phone
>        calls from the evaluator for the neurpsych eval?
>
> A.    Yes.

(Session I Tr. at 91; *see also* S-56 at 6-7, S-57 at 1, S-58 at 1.)

Based on the above testimony, the testimony of D.D., and other exhibits in the administrative record, the Court concludes that the Hearing Officer's finding as to parental participation is supported by a preponderance of the evidence.  The Court further finds that D.D. not only failed to cooperate with J.D.'s re-evaluation, but also failed to communicate and cooperate with school administrators at both PA Virtual and Elwyn-Davidson.

> ### E.    D.D.'s Due Process Rights Were Not Violated as the Hearing Officer Did Not Curtail D.D.'s Ability to Present Her Case at the Administrative Hearing

The IDEA provides that "[i]n matters alleging a procedural violation, a hearing officer may find that a child did not receive a [FAPE] only if the procedural inadequacies—(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(ii)(I)-(III); *see also C.M.*, 128 F. App'x at 881 ("A plaintiff bears the burden of establishing the harm caused by the claimed procedural shortcomings[.]").

Here, D.D. "asserts that the Hearing Officer violated her due process rights as provided in the IDEA . . . by precluding her from introducing the testimony of two witnesses, [by directing the order of witnesses without adequate advance notice,] and [by] precluding meaningful cross-examination of the child's father."  (Plfs.' Mot. at 33; Compl. ¶¶ 31, 37.)  More specifically, Plaintiffs assert that it was "clear error for the Hearing Officer" to bar testimony from "Mr. Ray

Stitt, who worked with J.D. as a safety instructor," and "Dr. Pezzulo, the school psychologist

who conducted the evaluation of J.D."  (Plfs.' Mot. at 34.)  Plaintiffs further contend that the

Hearing Officer "violated D.D.'s procedural rights" by "directing, less than three business days

before the hearing, that D.D. testify as the first witness in the Parent's case."  (Compl. ¶ 31.)

This Court finds that D.D.'s due process rights under the IDEA were not violated.  First,

with regard to allowing the testimony of Mr. Stitt, the Court finds that it was not improper for the

Hearing Officer to bar his testimony.  Despite ample time between the two hearings on July 31,

2018 and September 14, 2018, D.D. failed to produce any invoices or other documentary

evidence to validate that Mr. Stitt provided any services or programming for J.D. during the 2018

ESY home-based program—thus, it was not improper for the Hearing Officer to bar his

testimony.  (*See* Session II Tr. at 21-25.)[10]  Second, with regard to allowing the testimony of Dr.

Pezzulo, the Hearing Officer correctly determined that there was no reason for the school

psychologist to testify given that he had no updated or cognitive achievement test results from

Dr. Stone (the private neuropsychologist with whom D.D. failed to scheduling testing).  Under

these circumstances, Dr. Pezzulo could not provide any substantive testimony.  The Court finds

that the Hearing Officer made no mistake and further finds that this issue was not only

thoroughly discussed but adequately resolved at the September 14, 2018 hearing.  (*See* Session II

Tr. at 25-29.)  Third, the Court simply finds no error with the order of witnesses, and particularly

---

[10] The Hearing Officer correctly stated:  "[T]he question becomes should Mr. Stitt be heard about the reimbursement claim.  Services aside.  To the extent that [D.D.] seeks me to order reimbursement, there's nothing on which I could base that finding in the record, at least what's been presented to me here. And it's problematic because at that point, in effect, Parent is saying order that I be reimbursed, but there's no basis for that reimbursement . . . [B]ased on when the complaint was filed, our identification of the issues, our hearing some six weeks ago, I go further to say that that evidence could be produced . . . That is, services that would have unfolded over the past, roughly, two-and-a-half months, June 15 to the end of August.  That evidence could be produced to verify the claim.  And so I don't know that I'm inclined to hear from Mr. Stitt as part of the reimbursement claim."  (Session II Tr. at 23.)

the Hearing Officer's direction that D.D. testify first at the hearing held on July 31, 2018.  (*See* Session I Tr. at 18.)  The Court notes that the Pennsylvania Department of Education Office for Dispute Resolution Manual explicitly provides that "Hearing officers retain the discretion to regulate the conduct of the hearing, including the order of presentation."  *See* Office for Dispute Resolution Manual, *Pennsylvania Department of Education*, https://odr-pa.org/wp-content/uploads/Dispute-Resolution-Manual.pdf (last visited November 25, 2020).  Lastly, this Court finds that D.D.'s counsel had a meaningful opportunity to cross-examine J.D.'s father. (*See* Session I. Tr. at 61-63.)  The Hearing Officer appropriately ended the examination once he determined that the elicited testimony was only about the "family dynamic," and no longer relevant or probative to the proceedings.  (*Id*. at 63.)

Accordingly, upon review of the administrative record, the Court finds no procedural inadequacies or any violation of D.D.'s due process rights under the IDEA.  Moreover, because there are no facts on record that suggest that D.D. was seriously deprived of her participation rights or that J.D.'s educational interests were prejudiced by what D.D. characterizes as "procedural issues related to the due process hearing[,]" the Court also finds that no damages would be available to Plaintiffs on their IDEA claim.  (*See* Plfs.' Mot. at 33); *see also C.M.*, 128 F. App'x at 881 ("[O]nly those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable.").

## VI.    CONCLUSION

In this Court's view, the Hearing Officer conducted an impartial two-day due process hearing and thoroughly evaluated the evidence and testimony presented by both parents, PA Virtual and Elwyn-Davidson, and related service providers.  This Court further finds the Hearing Officer's decision well-reasoned and detailed.  "Courts have been cautioned against supplanting

the Court's judgment for that of the state agency, with expertise in the field." *J.E. v. Boyertown Area Sch. Dist.*, 834 F. Supp. 2d 240, 256 (E.D. Pa. 2011).  In this case, no basis exists to disturb the Hearing Officer's findings of fact and conclusions of law, which  must be afforded due weight.   The record as a whole amply supports the critical facts found by the Hearing Officer, and the legal conclusions he reached are consistent with the requirements of the IDEA and Section 504.  Accordingly, for the reasons discussed above, the Court will grant the Defendant's motion, affirm the Hearing Officer's decision,  and deny Plaintiffs' cross-motion.

**IT IS SO ORDERED.**

> **BY THE COURT:**
>
>  /s/ John Milton Younge_____
> **Judge John Milton Younge**